THIERMAN LAW FIRM
Mark Thierman, Nev. Bar No. 8285
7287 Lakeside Drive
Reno, Nevada 89511
T: (775) 284-1500
F: (775) 703-5027

KULLER LAW PC
Jason Kuller, Nev. Bar No. 12244
10775 Double R Blvd.
Reno, Nevada 89521
Tel: (855) 223-2677
Fax: (855) 810-8103
Email: Jason@kullerlaw.com

Attorney for Plaintiff(s)

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| TIMOTHY DEMBECK, an individual, on behalf of himself and others similarly situated,<br><br>    Plaintiff(s),<br><br>  vs.<br><br>CHARTER COMMUNICATIONS, INC., a Delaware corporation; GUILLERMO "BILL" RIVAS, an individual; and DOES 1 through 50, inclusive,<br><br>    Defendants. | CASE NO.<br><br>**CLASS AND COLLECTIVE ACTION COMPLAINT FOR:**<br><br>1) Failure to Pay Overtime;<br>2) Failure to Pay for All Hours Worked;<br>3) Failure to Timely Pay All Wages Due;<br><br>**INDIVIDUAL COMPLAINT FOR:**<br><br>4) Discrimination;<br>5) Retaliation;<br>6) Interference with Protected Leave;<br>7) Failure to Accommodate;<br>8) Harassment/Hostile Work Environment;<br>9) Tortious Discharge;<br>10) Defamation; and<br>11) Intentional Infliction of Emotional Distress.<br><br>**JURY DEMAND** |

Plaintiff Timothy Dembeck alleges as follows:

## NATURE OF ACTION

1.      This action seeks class and collective action relief for Defendants' failure to pay wages and overtime to Plaintiff and other similarly-situated individuals under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219, and other state and federal law.  Plaintiff also individually seeks relief for Defendants' discrimination, retaliation, interference with protected medical leave, failure to accommodate, harassment, tortious discharge, defamation, and intentional infliction of emotional distress under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-2654, the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12117, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-34, Title VII of the Civil Rights Act of 1964 "(Title VII"), 42 U.S.C. § 2000e et seq., and Nevada's equal employment opportunity laws ("State EEO Laws"), N.R.S. §§ 613.310-613.345, among other laws.

## PARTIES

2.      At all relevant times, Plaintiff Timothy Dembeck ("Plaintiff" or "Mr. Dembeck") is and was a Nevada resident.

3.      At all relevant times, Defendant Charter Communications, Inc. ("Charter Inc.") was a corporation organized under Delaware law with its principal place of business at 12405 Powerscourt Drive, Saint Louis, Missouri 63131.  Charter Inc. is a cable service provider with 15 or more employees.

4.      Plaintiff is informed and believes and based thereon alleges that, at all relevant times, Defendant Guillermo "Bill" Rivas ("Rivas") was a California resident and served as a Director of Sales and Marketing for Charter Inc.

5.      Unless otherwise specified, Defendants Charter Inc. and Rivas are herein collectively referred to as "Defendants" or "Charter."

6.      The identities of Does 1-50 are unknown at this time, and this Complaint will be amended at such time when Plaintiff learns of their identities.  Plaintiff is informed and believes that each of the Defendants sued herein as "Doe" is responsible in some manner for the acts,

1    omissions, or representations alleged herein and any reference to "Defendant," "Defendants,"
2    "Charter," or "Rivas" herein shall mean "Defendants and each of them."

3          7.    At all relevant times herein, Defendants were a covered entity and employer for
4    purposes of Mr. Dembeck's claims under the FLSA, FMLA, ADA, Title VII, and Nevada law.

5                              <u>**JURISDICTION AND VENUE**</u>

6          8.    This Court has original jurisdiction over Mr. Dembeck's wage claims under the
7    FLSA pursuant to 29 U.S.C. § 216(b), which states "An action to recover the liability prescribed
8    in either of the preceding sentences may be maintained against any employer (including a public
9    agency) in any Federal or State court of competent jurisdiction by any one or more employees
10   for and in behalf of himself or themselves and other employees similarly situated."

11         9.    Because Mr. Dembeck's claims under the FLSA, FMLA, ADA, ADEA, and
12   Title VII arise under federal law, the Court has federal question jurisdiction pursuant to 28
13   U.S.C §1331.

14         10.   In addition, this Court has supplemental jurisdiction under 28 U.S.C. § 1367 over
15   Mr. Dembeck's Nevada state law claims because those claims derive from a common nucleus
16   of operative fact regarding Defendants' unlawful treatment of Mr. Dembeck and putative class
17   members, and form part of the same case and controversy.

18         11.   Venue is proper in this Court because Mr. Dembeck resides and worked for
19   Defendants within this judicial district, and the events and omissions giving rise to Mr.
20   Dembeck's claims occurred within this judicial district.  *See* 28 U.S.C. § 1391(b)

21
22                              <u>**FACTUAL ALLEGATIONS**</u>

23         12.   Mr. Dembeck worked for Charter as a Multi-Dwelling Unit (or "MDU")
24   Account Executive from approximately February 6, 1995, until approximately November 29,
25   2011.

26         13.   Mr. Dembeck was an exemplary employee and received numerous awards
27   during his tenure at Charter, including Salesperson of the Year in 2002 and an MDU
28   Achievement Award in 2009 for hitting 161% of his target.

14.     Despite Mr. Dembeck's proven track record and accomplishments, Charter hired another MDU Account Executive, Suzanne Marten, near the beginning of 2010.

15.     At the time of Marten's hire, Mr. Dembeck had been the only Reno-based MDU Account Executive for the Northwest Key Market Area ("NW KMA"), covering Nevada, Oregon, Washington, Redding, CA, and Crescent City, CA.

16.     Significantly, Marten was hired at a lower rate of compensation than Mr. Dembeck.  In addition, Ms. Marten was a female under 40 years of age whereas Mr. Dembeck was a male over 40 years of age.

17.     The stated reason for Marten's hire was that Charter needed another MDU Account Executive to service the NW KMA territory.  In fact, Mr. Dembeck had excelled at servicing this territory up until that time, and the territory was additionally being serviced by various "independent contractors" hired by Charter.

18.     Mr. Dembeck immediately expressed concern to his supervisor, Guillermo "Bill" Rivas, over how both Marten and he would service the same territory.  Rivas refused to discuss any specific plan for how the territory would be shared, or how Mr. Dembeck and Marten would work together.  Instead, Rivas asked Mr. Dembeck for a list of the accounts on which he was working.

19.      As subsequent events would show, the real objective and result of Marten's hire was to cannibalize Mr. Dembeck's sales, transfer his accounts to a younger, "prettier" lower-paid worker, and, ultimately, render Mr. Dembeck expendable.

20.     Indeed, within a month or two of Marten's hire, Mr. Dembeck received his first-ever corrective action – from Rivas – for an allegedly "unexcused" absence.  This disciplinary action was both vague and false.  Furthermore, although Mr. Dembeck was Charter's third highest-producing MDU Account Executive at the time, Rivas began micro-managing Mr. Dembeck, such as monitoring his start time.

21.     While Mr. Dembeck was being disciplined and micro-managed, Rivas trained and gave preferential treatment to Marten. As an example, Rivas assigned Marten to renew bulk agreements, which were relatively easy deals to put units under contract.  When a NW KMA

account executive left Charter, Rivas transferred the accounts to Marten and another young female (Brandi Christi).   In general, Rivas distributed leads and prospects on the basis of sexism, ageism, and other non-legitimate factors.   In contrast, Mr. Dembeck was not given any leads or support from Charter during this time, including from Rivas, his successor (Sandy McDonald), or vertical management (Joe Geroux).

22.     Following Marten's hire, and as a result of Rivas's micro-management and discrimination, Mr. Dembeck's performance began to suffer for the first time in 15 years, just one year removed from his 2009 MDU Achievement Award.   This was due to Charter discrimination against Mr. Dembeck, not any sudden performance shortcoming.

23.     Also starting in 2010, Charter began to manufacture negative performance reviews against Mr. Dembeck.  These bogus performance reviews reached their zenith on June 22, 2011, when Geroux took corrective action against Mr. Dembeck by instituting a performance improvement plan ("PIP").  The supposed basis for the PIP was Mr. Dembeck's failure to make minimum quota of 500 units per month for the first six months of 2010.  As of June 22, 2011, however, Mr. Dembeck had sold 2,892 units for a prorated average of 504.71 units per month. His non-prorated average (i.e., counting the remaining 8 days of June as closed) was 482 units per month – which was over 50 units *more* than the improvement "goal" of 425 units per month identified by his PIP.  In addition, prior to instituting the PIP, Charter did not counsel Mr. Dembeck in any previous month of 2011 that he was not meeting his quota.

24.     The PIP established a 30-day window until July 22, 2011, for Mr. Dembeck to meet his improvement "goal" of 425 units per month (which, again, he was already exceeding). On July 22, 2011, Mr. Dembeck had 565 units under contract – or 133% of his target quota. Mr. Dembeck thus exceeded the objectives of the PIP, which should have terminated at that time by its own terms.   Instead, Charter extended the PIP another 30 days.  Mr. Dembeck was thus subject to discipline regardless whether he met his quota.

25.     Even though Mr. Dembeck had satisfied his original PIP, the extended PIP continued to impose administrative controls and procedures over Mr. Dembeck (such as requiring him to email a detailed schedule of his proposed activities by 11:00 AM each day).

1    These new controls and procedures actually diverted Mr. Dembeck from sales activities and his
2    supposed performance objectives.

3         26.    Mr. Dembeck's mid-year performance review on August 19, 2011, also falsely
4    asserted that Mr. Dembeck was not meeting performance expectations. Notwithstanding that
5    Mr. Dembeck averaged over 500 units per month for 2011 at the time of his original PIP in
6    June, and sold an additional 565 units during the PIP ending in July, the review purported to
7    assign an objective performance score of .38 on a 2.00 scale. The review was devoid of specific
8    examples justifying its "objective" numerical rating, and the vague comments provided
9    (authored by Rivas) were refuted by Mr. Dembeck with specific examples of his true job
10   performance.

11        27.    Incredibly, Charter used Mr. Dembeck's rebuttal as the basis for further
12   corrective action. In this way, Charter would not even allow Mr. Dembeck to defend his job
13   performance with truth.

14        28.    Two days after his bogus mid-year performance review, Mr. Dembeck was
15   rushed to the emergency room by his wife with symptoms of high blood pressure, panic, and
16   severe distress. This was on Sunday, August 21, 2011, the day before Mr. Dembeck would
17   have reported to work after his review.

18        29.    Mr. Dembeck was ultimately required to obtain a medical leave of absence in
19   order to address his serious health condition. Although Mr. Dembeck's request for medical
20   leave was initially approved around August 30, 2011, Charter inexplicably required additional
21   medical information and recertification less than two weeks later, vaguely citing an
22   "inconsistency" with his original medical certification.

23        30.    In addition to making Mr. Dembeck jump through unnecessary medical hoops,
24   Charter also failed to accommodate Mr. Dembeck's health condition in other ways. For
25   example, Charter made no adjustment to its performance expectations of Mr. Dembeck, even
26   though Mr. Dembeck was now required to work a reduced and intermittent schedule.

27        31.    Charter also refused to allow Mr. Dembeck to work from home as instructed by
28   his doctor, even though Mr. Dembeck had done so throughout his employment history, and

working from home would have allowed Mr. Dembeck to be more productive.  The stated reason for denying Mr. Dembeck's request was that Charter had a "no telecommuting" policy, even though no such policy appears in Charter's employee handbook, or in any Charter policy anywhere.  Even assuming such a policy existed; Charter management clearly had discretion to override it in order to accommodate an employee's serious health condition.  The requested accommodation was reasonable (recommended by his doctor) and would have allowed Mr. Dembeck to perform the essential functions of his job.

32.     Charter used Mr. Dembeck's medical absences as an excuse to transfer some of his accounts to Marten.  Mr. Dembeck was on track to make his quota for the month of November 2011, with at least 578 units under contract or being finalized.  Based on these pending sales, Sandy McDonald verbally assured Mr. Dembeck not to worry about his job security over the Thanksgiving holiday.  Yet immediately after Thanksgiving, and before these sales became finalized, Charter terminated Mr. Dembeck on November 29, 2011, two days before the end of the month.  Significantly, Mr. Dembeck's pending sales did become final over the next two days, which would have put him over quota for the month of November.  Charter deliberately terminated Mr. Dembeck before the end of the month, and before his sales became final, in order to bolster its so-called "legitimate business reason" for termination.

33.     On top of everything else, Charter did not pay Mr. Dembeck (or other similarly-situated account executives) properly.  Charter apparently classified Mr. Dembeck as an exempt "outside" salesperson even though his primary duty was actually "inside" sales.  Indeed, Charter made it a point for Mr. Dembeck to be "at his desk" working rather than in the field or at home.  Mr. Dembeck, as well as other "account executives," routinely worked more than 8 hours a day and 40 hours per week in order to meet their quota and satisfy Charter's other performance demands.

34.     Significantly, on September 15, 2011, Charter had circulated a memo to Mr. Dembeck (and others) citing "a new requirement in the State of Nevada regarding the recording of time by exempt employees."  According to Charter, this "new" requirement became effective as of January 1, 2011.  In fact, this was not a "new" legal requirement and is yet another

1  example of Charter's false and pretextual documentation.  It is also illustrative of Charter's
2  lawbreaking.

3       35.    Because of Defendants' conduct, Mr. Dembeck has suffered severe economic
4  damage and emotional distress.

5       36.    All allegations in this Complaint are based upon information and belief except
6  for those allegations that pertain to the Plaintiff named herein and his counsel.  Each allegation
7  in this Complaint either has evidentiary support or is likely to have evidentiary support after a
8  reasonable opportunity for further investigation and discovery.

9  <u>**CLASS AND COLLECTIVE ACTION ALLEGATIONS**</u>

10       37.    Plaintiff realleges and incorporates by this reference all the paragraphs above in
11  this Complaint as though fully set forth herein.

12       38.    At all relevant times, Mr. Dembeck was an "employee" as that term is defined in
13  N.R.S. 608.010 and the FLSA, and his wage and hour claims are typical for all such claims by
14  other so-called "account executives."

15       39.    Plaintiff brings his wage claims on behalf of himself and on behalf of all workers
16  employed by Defendants as exempt "account executives" or inside salespeople (collectively
17  "the Class" or "Class Members") at anytime during the three years prior to the filing of this
18  Complaint until the date of judgment after trial herein ("the Class Period").

19       40.    Defendants employ, and have employed, in excess of 50 Class Members within
20  the applicable Class Period. Because Defendants are legally obligated to keep accurate payroll
21  records, Defendants' records will establish the members of the Class as well as their
22  numerosity.

23       41.    The Class is subdivided into three subclasses of similarly-situated individuals
24  (collectively "the Subclasses" or "Subclass Members"):

25       A.    **The FLSA Subclass:**  All current and former employees who, at any time
26          during the Class Period, worked as exempt account executives or inside
27          salespersons (collectively the "FLSA Subclass Members").

28

B.   **The State Subclass:**   All current and former hourly non-exempt employees who, at any time during the Class Period, worked as exempt account executives or inside salespersons (collectively the "State Subclass Members").

C.   **The Waiting Time Subclass:**   All current and former members of the State Subclass who, at any time during the Class Period, were terminated or otherwise separated from employment (collectively the "Waiting Time Subclass Members").

These Subclasses overlap and Class Members may be members of one or more Subclass.

42.   Plaintiff's class claims are typical of the claims of the Class Members and of each Subclass, and each Subclass Member is and was subject to the same policies as Plaintiff.

43.   Defendants failed to pay Plaintiff, as well as FLSA Subclass Members and State Subcass Members for all hours of work, including overtime hours.

44.   Defendants failed to pay Plaintiff and Waiting Time Subclass Members all wages due and owing at the time of their termination or separation from employment.

45.   At all relevant times, Defendants' actions were company policy applicable to Plaintiff and all employees in the Subclasses described above.  Plaintiff, like other Class and Subclass members, was subjected to Defendants' policies and practices failing to pay wages for all hours and overtime hours worked and failing to timely pay all wages due and owing.  Proof of a common or a single state of facts will thus establish the right of each Class and Subclass member to recover.

46.   Common questions of law and fact exist and predominate as to Plaintiff and Class Members, including, without limitation:

a)   Whether Defendants misclassified Class Members as exempt;

b)   Whether Defendants maintained legally-required payroll records for each Class Member;

c)   Whether Defendants paid FLSA Subclass Members for each and every overtime hour worked;

d) Whether Defendants paid State Subclass members for each and every overtime hour worked;

e) Whether Defendants' violations of the FLSA were willful;

f) Whether Defendants compensated Plaintiff and State Subclass Members for "each hour the employee works" under N.R.S. § 608.016;

g) Whether Defendants compensated Plaintiff and State Subclass Members for "all time worked by the employee at the direction of the employer, including time worked by the employee that is outside the scheduled hours of work of the employee" pursuant to the Nevada Administrative Code, N.A.C. 608.115(1); and

h) Whether Defendants compensated Plaintiff and Waiting Time Subclass Members all earned and unpaid wages or compensation in accordance with N.R.S. §§ 608.020-050.

47.     Plaintiff will fairly and adequately represent and protect the interests of the Class and Subclasses and has no interests that conflict or are antagonistic to the interests of Class and Subclass members. Plaintiff has retained counsel competent and experienced in complex class actions, including labor and employment litigation.  Plaintiff and counsel are aware of their fiduciary responsibilities to Class members and are determined to discharge those duties diligently by vigorously seeking the maximum possible recovery for Class members.

48.     A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Each Class Member has been damaged and is entitled to recovery by reason of Defendants' illegal policies and practices of failing to compensate their employees in accordance with federal and Nevada wage and hour law.  Class certification of the First, Second, and Third Causes of Action is appropriate because questions of law and fact common to the Class and Subclasses predominate over any questions affecting only individual members of the Class and Subclasses.

## AGENCY, JOINT VENTURE, CONSPIRACY

49.     At all relevant times, each Defendant was an agent, employee, joint-venturer, shareholder, director, member, co-conspirator, alter ego, master, or partner of each of the other Defendants, and at all times mentioned herein were acting within the scope and course and in

pursuance of his, his, or its agency, joint venture, partnership, employment, common enterprise, or actual or apparent authority in concert with each other and the other Defendants.

50.     At all relevant times, the acts and omissions of Defendants concurred and contributed to the various acts and omissions of each and every one of the other Defendants in proximately causing the complaints, injuries, and damages alleged herein.  At all relevant times herein, Defendants approved of, condoned and/or otherwise ratified each and every one of the acts or omissions complained of herein.  At all relevant times herein, Defendants aided and abetted the acts and omissions of each and every one of the other Defendants thereby proximately causing the damages as herein alleged.

### FIRST CAUSE OF ACTION

### Failure to Pay Overtime

(On Behalf of Plaintiff and FLSA and State Subclass Members)

51.     Plaintiff realleges and incorporates by this reference all the paragraphs above in this Complaint as though fully set forth herein.

52.     Section 7(a)(1) of the Fair Labor Standards Act, 29 U.S.C. 207(a)(1) states that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

53.     NRS 608.018 provides that "An employer shall pay 1 1/2 times an employee's regular wage rate whenever an employee who receives compensation for employment at a rate less than 1 1/2 times the minimum rate prescribed pursuant to NRS 608.250 works: (a) More than 40 hours in any scheduled week of work; or (b) More than 8 hours in any workday unless by mutual agreement the employee works a scheduled 10 hours per day for 4 calendar days within any scheduled week of work."

54.     No exemption or exception to the provisions of the FLSA or NRS 608.018 apply to Plaintiff or other Class Members.

55.     Plaintiff and FLSA Subclass Members and State Subclass Members routinely worked in excess of 8 hours a day and/or 40 hours a week.

56.     Here, by misclassifying Plaintiff and Class Members as exempt, Defendants failed to pay overtime wages to Plaintiff and FLSA and State Subclass Members.

57.     Because Defendants' violations of the FLSA were willful, a three-year statute of limitations applies.  *See* 29 U.S.C. § 255(a).

58.     Because there is no express statute of limitations for violations of N.R.S. 608.016, the three-year statute contained in N.R.S. 11.190(3) for statutory violations applies.

59.     Wherefore, Plaintiff demands for himself and for other FLSA and State Subclass Members payment by Defendants of overtime wages for all hours worked over 8 in a day or 40 in a workweek during the Class Period, whichever is greater together with liquidated damages, attorneys' fees, costs, and interest provided by law.

## SECOND CAUSE OF ACTION

### Failure to Pay Wages for All Hours Worked under Nevada Law

(On Behalf of Plaintiff and State Subclass Members)

60.     Plaintiff realleges and incorporates by this reference all the paragraphs above in this Complaint as though fully set forth herein.

61.     N.R.S. 608.140 provides employees a private right of action to recoup unpaid wages.

62.     N.R.S. 608.016 states that "An employer shall pay to the employee wages for ***each hour the employee works***."   (Emphasis added.)   Hours worked means anytime the employer exercises "control or custody" over an employee.  *See* N.R.S. 608.011 (defining an "employer" as "every person having control or custody of any employment, place of employment or any employee.").  Pursuant to the Nevada Administrative Code, hours worked includes "all time worked by the employee at the direction of the employer, including time worked by the employee that is outside the scheduled hours of work of the employee." N.A.C. 608.115(1).

63.     Here, by misclassifying Plaintiff and Class Members as exempt, Defendants failed to pay Plaintiff and State Subclass Members for each hour worked.

64.     Because there is no express statute of limitations for violations of N.R.S. 608.016, the three-year statute contained in N.R.S. 11.190(3) for statutory violations applies.

65.     Wherefore, Plaintiff demands for himself and for State Automatic Deduction Subclass Members payment by Defendants of their regular hourly wage rate for all hours worked during the Class Period, together with attorneys' fees, costs, and interest provided by law.

## THIRD CAUSE OF ACTION

### For Waiting Time Wages under Nevada Law

(On Behalf of Plaintiff and Waiting Time Subclass Members)

66.     Plaintiff realleges and incorporates by this reference all the paragraphs above in this Complaint as though fully set forth herein.

67.     N.R.S. 608.020 provides that "[w]henever an employer discharges an employee, the wages and compensation earned and unpaid at the time of such discharge shall become due and payable immediately."

68.     N.R.S. 608.030 provides that "[w]henever an employee resigns or quits his or his employment," the employee must be paid no later than the earlier of: (1) seven days after the employee resigns or quits; or (2) the employee's regular payday.

69.     N.R.S. 608.040(1) requires an employer to pay a former employee "[w]ithin 3 days after the wages or compensation of a discharged employee becomes due" or "[o]n the day the wages or compensation is due to an employee who resigns or quits."  If an employer fails to do so, "the wages or compensation of the employee continues at the same rate from the day the employee resigned, quit, or was discharged until paid for 30-days, whichever is less."  N.R.S. 608.040(1).

70.     In addition, N.R.S. 608.050 grants a "lien" to former employees for "the amount of any wages or salary at the time the same becomes due and owing to them under their contract of employment, whether employed by the hour, day, week or month."  Under this section, "each of the employees may charge and collect wages in the sum agreed upon in the contract of employment for each day the employer is in default, until the employee is paid in full, without

1  rendering any service therefor; but the employee shall cease to draw such wages or salary 30

2  days after such default." N.R.S. 608.050.

3        71.    Here, Defendants failed to pay Plaintiff and Waiting Time Subclass Members

4  (who are former employees) all the wages and compensation due and owing upon their

5  separation from employment.

6        72.    Because there is no express statute of limitations for violations of N.R.S.

7  608.020-050, the three-year statute contained in N.R.S. 11.190(3) for statutory violations

8  applies.

9        73.    Wherefore, Plaintiff demands for himself and for each Waiting Time Subclass

10  Member up to thirty (30) days of pay for each and every day during the Class Period that

11  Defendants failed to pay wages or compensation due or owing upon their separation from

12  employment, together with attorneys' fees, costs, and interest provided by law.

13                          **FOURTH CAUSE OF ACTION**

14            **For Discrimination and Retaliation in Violation of the FMLA**

15                             (On Behalf of Plaintiff)

16        74.    Plaintiff realleges and incorporates by this reference all the paragraphs above in

17  this Complaint as though fully set forth herein.

18        75.    Under the FMLA, "It shall be unlawful for any employer to discharge or in any

19  other manner discriminate against any individual for opposing any practice made unlawful by

20  this subchapter." 29 U.S.C. § 2615(a)(2).

21        76.    During his employment for AWG, Mr. Dembeck was entitled to medical leave

22  under the FMLA and he invoked his right to take medical leave as protected under the FMLA.

23        77.    By engaging in the conduct alleged above, Defendants discriminated and

24  retaliated against Mr. Dembeck for exercising his right to medical leave protected under the

25  FMLA.

26        78.    Mr. Dembeck is informed and believes that Defendants conduct was motivated

27  by and in retaliation for his taking of medical leave protected under the FMLA.

28                          **FIFTH CAUSE OF ACTION**

**For Interference with Leave Protected by the FMLA**

(On Behalf of Plaintiff)

79.     Plaintiff realleges and incorporates by this reference all the paragraphs above in this Complaint as though fully set forth herein.

80.     The FMLA provides that an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" FMLA rights.  29 U.S.C. § 2615(a)(1).

81.     By engaging in the conduct alleged above, Defendants violated Section 2615(a)(1) of the FMLA.

## SIXTH CAUSE OF ACTION

**For Disability Discrimination in Violation of the ADA and State EEO Laws**

(On Behalf of Plaintiff)

82.     Plaintiff realleges and incorporates by this reference all the paragraphs above in this Complaint as though fully set forth herein.

83.     It is unlawful under the ADA and State EEO Laws for an employer to discriminate against an employee based on the disability of that person.  42 U.S.C. § 12112(a); N.R.S. § 613.330(1).

84.     Mr. Dembeck's serious health condition qualified as a disability within the meaning of the ADA and State EEO Laws.

85.     By engaging in the conduct alleged above, Defendants discriminated against Mr. Dembeck because of his disability and also failed to reasonably accommodate Mr. Dembeck's disability.

86.     Mr. Dembeck could and would have performed the essential functions of his job with reasonable accommodation.

87.     Defendants acted intentionally, with malice, fraud, or oppression, in discriminating against Mr. Dembeck because of his disability.

88.     As a result of Defendants' wrongful actions, Mr. Dembeck has suffered and continues to suffer loss of earnings, damage to reputation and career, and severe anguish and emotional distress.   Plaintiff seeks all damages and remedies available to his under law

including, but not necessarily limited to, compensatory, consequential, and punitive damages, attorneys' fees, costs, and interest.

89.     Mr. Dembeck has exhausted his administrative remedies with the Nevada Equal Rights Commission ("NERC") and/or Equal Employment Opportunity Commission ("EEOC"). The EEOC investigated Mr. Dembeck's charge and mailed a "right to sue" notice on or about July 30, 2013.  Mr. Dembeck timely filed this lawsuit within 90 days of receiving the EEOC notice.

<strong><u>SEVENTH CAUSE OF ACTION</u></strong>

<strong><u>For Sex Discrimination in Violation of Title VII and State EEO Laws</u></strong>

(On Behalf of Plaintiff)

90.     Plaintiff re-alleges and incorporates the foregoing paragraphs as though fully set forth herein.

91.     It is unlawful under Title VII and State EEO Laws for an employer to discriminate against an employee based on the sex of the employee.  42 U.S.C. § 2000e-2(a); N.R.S. 613.330(1).

92.     Here, Defendants unlawfully discharged and otherwise discriminated against Mr. Dembeck with respect to the compensation, terms, conditions, and privileges of his employment because of his sex.

93.     Defendants acted intentionally, with malice, fraud, or oppression, in discriminating against Mr. Dembeck because of his sex.

94.     As a result of Defendants' wrongful actions, Mr. Dembeck has suffered and continues to suffer loss of earnings, damage to reputation and career, and severe anguish and emotional distress.   Plaintiff seeks all damages and remedies available to his under law including, but not necessarily limited to, compensatory, consequential, and punitive damages, attorneys' fees, costs, and interest.

95.     Mr. Dembeck has exhausted his administrative remedies with NERC and/or the EEOC.  The EEOC investigated Mr. Dembeck's charge and mailed his a "right to sue" notice

on or about July 30, 2013.  Mr. Dembeck timely filed this lawsuit within 90 days of receiving the EEOC notice.

### EIGHTH CAUSE OF ACTION

### For Age Discrimination in Violation of the ADEA and State EEO Laws

(On Behalf of Plaintiff)

96.     Plaintiff re-alleges and incorporates the foregoing paragraphs as though fully set forth herein.

97.     It is unlawful under ADEA and State EEO Laws for an employer to discriminate against an employee based on the age of the employee.  29 U.S.C. § 623(a); N.R.S. 613.330(1).

98.     Here, Defendants unlawfully discharged and otherwise discriminated against Mr. Dembeck with respect to the compensation, terms, conditions, and privileges of his employment because of his age over 40 years old.

99.     Defendants acted intentionally, with malice, fraud, or oppression, in discriminating against Mr. Dembeck because of his age.

100.    As a result of Defendants' wrongful actions, Mr. Dembeck has suffered and continues to suffer loss of earnings, damage to reputation and career, and severe anguish and emotional distress.   Plaintiff seeks all damages and remedies available to his under law including, but not necessarily limited to, compensatory, consequential, and punitive damages, attorneys' fees, costs, and interest.

101.    Mr. Dembeck has exhausted his administrative remedies with NERC and/or the EEOC.  The EEOC investigated Mr. Dembeck's charge and mailed his a "right to sue" notice on or about July 30, 2013.  Mr. Dembeck timely filed this lawsuit within 90 days of receiving the EEOC notice.

### NINTH CAUSE OF ACTION

### For Harassment/Hostile Work Environment

(On Behalf of Plaintiff)

102.    Plaintiff re-alleges and incorporates the foregoing paragraphs as though fully set forth herein.

103.    Defendants, by their actions alleged above, subjected Mr. Dembeck to a hostile work environment.  During his employment, Defendants repeatedly subjected Mr. Dembeck to unwelcome statements and conduct based on his age, sex, disability, and protected leave status. These statements and conduct were sufficiently severe or pervasive to alter the conditions of employment by creating an intimidating, hostile, or offensive work environment.

104.    Defendants acted intentionally, with malice, fraud, or oppression, by harassing Mr. Dembeck and creating a hostile work environment based on his age, sex, disability, and protected leave status.

105.    As a result of Defendants' wrongful actions, Mr. Dembeck has sustained significant general and special damages to be proven at trial.  Plaintiff seeks all damages and remedies available to his under law including, but not necessarily limited to, compensatory, consequential, and punitive damages, attorneys' fees, costs, and interest.

## TENTH CAUSE OF ACTION

### For Tortious Discharge

(On Behalf of Plaintiff)

106.    Plaintiff re-alleges and incorporates the foregoing paragraphs as though fully set forth herein.

107.    Defendants' actions, as alleged above, are contrary to substantial and fundamental public policies delineated in both state and federal laws, including but not limited to State EEO Laws, the FMLA, the ADA, the ADEA, and Title VII.  These state and federal laws articulate substantial and fundamental public policies in favor of a workplace environment free from discrimination and harassment based on sex, age, disability, and the need for medical leave.

108.    Here, Defendants termination of Mr. Dembeck was wrongful, tortious, and contrary to the public policies of Nevada and of the United States.   Defendants acted intentionally, with malice, fraud, or oppression, in terminating Mr. Dembeck because of his sex, age, disability, and need for medical leave.

109.    As a result of Defendants' wrongful actions, Mr. Dembeck has sustained significant general and special damages to be proven at trial.  Plaintiff seeks all damages and remedies available to her under law including, but not necessarily limited to, compensatory, consequential, and punitive damages, attorneys' fees, costs, and interest.

## ELEVENTH CAUSE OF ACTION

### For Defamation

(On Behalf of Plaintiff)

110.    Plaintiff re-alleges and incorporates the foregoing paragraphs as though fully set forth herein.

111.    Defendant Rivas communicated false and defamatory statements about Mr. Dembeck's job performance to Joe Geroux, Sandy McDonald, and other members of Charter Management.  These statements resulted in false and defamatory discipline and performance reviews, ultimately costing Mr. Dembeck his job.

112.    Plaintiff alleges, based on information and belief, that Rivas also orally communicated false and defamatory statements about Mr. Dembeck's job performance.

113.    Plaintiff further alleges, based on information and belief, that Defendants communicated false and defamatory statements about Mr. Dembeck's job performance to prospective employers.

114.    Rivas and Defendants acted intentionally, with malice, fraud, or oppression, by defaming Mr. Dembeck, and their defamatory statements are not subject to any absolute or qualified privilege.

115.    As a result of Defendants' wrongful actions, Mr. Dembeck has sustained significant general and special damages to be proven at trial.  Plaintiff seeks all damages and remedies available to her under law including, but not necessarily limited to, compensatory, consequential, and punitive damages, attorneys' fees, costs, and interest.

## TWELFTH CAUSE OF ACTION

### For Intentional Infliction of Emotional Distress

(On Behalf of Plaintiff)

116.     Plaintiff re-alleges and incorporates the foregoing paragraphs as though fully set forth herein.

117.     Defendants' conduct, as alleged above, was extreme and outrageous with the intention of, or reckless disregard for, causing emotional distress to Mr. Dembeck.

118.     Mr. Dembeck suffered severe or extreme emotional distress as a result of Defendants' conduct.   Mr. Dembeck's emotional distress is manifested by the physical symptoms of high blood pressure, extreme stress and anxiety, panic attacks, and severe depression for which he has sought and obtained medical care.

## PRAYER FOR RELIEF

WHISEFORE Plaintiff prays for relief as follows:

1.     For an order conditionally certifying this action under the FLSA and providing notice to all Class Members so they may participate in this lawsuit;

2.     For an order certifying this action as a class action on behalf of the proposed Class and Subclasses;

3.     For an order appointing Plaintiff as representative of the Class and appointing his counsel as class counsel;

4.     For payment of all overtime hours worked by Plaintiff and FLSA Subclass Members and State Subclass Members pursuant to the FLSA and N.R.S. § 608.018, according to proof;

5.     For payment of all hours worked by Plaintiff and State Subclass Members pursuant to N.R.S. § 608.016, according to proof;

6.     For waiting time wages earned by Plaintiff and Waiting Time Subclass Members pursuant to N.R.S. §§ 608.040-.050, according to proof;

7.     For liquidated damages pursuant to 29 U.S.C. § 216(b);

8.     For restitution of all money due to Plaintiff and Class Members from the unjust enrichment of Defendants;

9.     On Plaintiff's individual claims, for compensatory damages, including front pay, back pay, lost wages and benefits, out-of-pocket costs and expenses, emotional

1    distress damages, punitive damages, as well as other special and general

2    damages, according to proof;

3    10.    For reasonable attorneys' fees authorized by statute, common law, or equity;

4    11.    For costs of suit incurred herein;

5    12.    For pre-judgment and post-judgment interest at the maximum legal rate;

6    13.    For exemption from the Nevada Arbitration Rules pursuant to N.A.R 3 and 5;

7           and

8    14.    For such other and further relief as the Court may deem just and proper.

9                                **JURY DEMAND**

10   Plaintiff hereby demands trial by jury of the above-captioned matter pursuant to LR 38-

11   1.

12

13   Dated: October 26, 2013                    THIERMAN LAW FIRM
                                                  KULLER LAW PC

14

15                                      By:    /s/ Jason J. Kuller

16                                             Jason Kuller

17                                             Attorney for Plaintiff(s)

18

19

20

21

22

23

24

25

26

27

28